Well, good morning everyone.On behalf of Judge Greenaway and Judge Roth, we're pleased to be here sitting in St. Croix. We have 15 cases scheduled for arguments this week, five of them here this morning. And the first case which we will call, I understand, is actually the second case on the list. Is that correct? Okay. We'll call the case of the United States of America versus Ammon Thomas, Mr. Enten. Alvin Enten May I please report? My name is Alvin Enten. I represent the appellant, Ammon Thomas. Your Honor, I'd like to speak, if I might, ten minutes in the initial presentation, reserving five minutes for rebuttal. That request will be granted. Thank you, Your Honor. The defendant was arrested in this matter in July of 2008 and charged, as relates to this case, on appeal with at least three counts in the indictment. One was possession with intent to distribute marijuana. A second was manufacture of marijuana. And a third was maintaining premises for the use of drugs. There were additional charges, but those were resolved at trial and are not before the court on appeal. There was a motion to suppress filed in January of 2009. There was a hearing. And on February the 19th of 2009, Judge Finch denied the motion to suppress in all particulars. Thereafter, trial was held and the defendant was convicted on the three counts that are before Your Honors today. There is a single issue on appeal, and that issue is whether or not the trial court had inappropriately denied the motion to suppress when there was no justification for the seizure of the defendant and his vehicle on the date of the arrest, initial arrest. The facts, Your Honor, are as follows. On May the 12th of 2008, an officer of the U.S. Mr. Anton, we're familiar with the facts. Why don't you – I know some of the facts are relevant to your argument. Why don't you get to the thrust of your argument? Okay. On that date in particular, Your Honor, and we're only going to be concerned with the stop and the seizure of the red Mitsubishi. Everything that comes thereafter, our position is, are fruits of the poisonous tree, and I'll get to that at a later point. But in any event, there are shots that are heard in the general areas described of Thomas Malloy, and they're heard by Officer Halinger, and I believe they're also heard by Officer Abraham. There is some discussion on various police radios about it, and as a result of these discussions, a silver Mitsubishi is seen traveling at a high rate of speed in that general area, and at some point in time, the police officer is making a determination to follow the silver Mitsubishi. While they're in the process of doing this, and they meet up to do it, they believe they see the silver Mitsubishi go up a road that has no other exit in or out, and they make a determination that they're going to follow that silver Mitsubishi, and as they do so, they observe a red Mitsubishi, a different car altogether, coming down from that same area, driving at what one of the officers called an exceptionally slow rate of speed. Now, they don't actually follow the silver car, do they? No, sir, they do not. They do not follow the silver car. They just know it goes down this one particular street. Yes, sir, that is correct. And what's more, they have no information that the silver car is involved at all with regard to the gunshots they had heard earlier, nor has there been any subsequent report that there had been a shooting. So other than one fact that there had been gunshots heard, and a second fact that a silver Mitsubishi was seen speeding in that area, there is no fact or factor that is known to the police officers that either tie the silver Mitsubishi to the shots, or the red Mitsubishi that is leaving that area. I'm not sure the silver car was a Mitsubishi, was it? It was a Japanese vehicle. All right, whatever. To me, they're all Mitsubishis. Is your position that there is no reasonable suspicion when the officers see a car coming towards them at a slow rate of speed and see someone apparently lying down in the backseat? That doesn't constitute reasonable suspicion. No, sir. Reasonable suspicion is defined under the case law as belief that there is criminal activity afoot, coupled with a particularized belief based upon facts and circumstances that indicate that either the vehicle or the individuals in the vehicle are somehow or other associated with the criminal activity. What's the temporal proximity of the gunshots, the car chase, and then seeing the red Mitsubishi? Isn't it a matter of minutes at most? Time-wise, it's hard to say. That's really not developed in the suppression hearing below. But I think it would be fair to say that maybe it's a 5 to 10-minute spread, which is not a huge period of time, but we're dealing with a small island. On a small island with a 5-minute spread? It's a factor that we have to keep in consideration, Judge Greenway. There's no question about it. However, the gunshots are heard coming from an area that's defined by everybody as being in the area of Thomas Malloy. Thomas Malloy, according to the evidence that's produced at the suppression hearing, is 1,000 or more feet away from where the silver car is seen to go to after it's already been speeding. But at no point in time is the silver car seen before the shots are fired. So there would be no reasonable suspicion that anything coming down from that location would have been involved. Assuming you want to assume that the silver car may have been involved with the shots, there was nothing to indicate that they had come from an area where the shots had taken place. But wasn't it evident that someone was lying in the backseat of the red car? Yes, but that's not an indication of criminal activity. Well, when you've heard shots and you see someone lying in the backseat of a car, you might at least want to look again. And then it becomes pretty obvious the guy's been shot, doesn't it? Well, no. A, it's not obvious that the person's been shot. As we indicated in the brief, I mean, you can be in possession of a gun and that gun would be legal as well and doesn't necessarily constitute reasonable suspicion for a carry stop. Well, I mean, if the guy's been shot, whether it's criminal or not, I think there's some concern that if he needs medical assistance and care, that that be brought about. And didn't that happen? They immediately called an ambulance. If that had been the thought process of the officer, then Your Honor might be right. I mean, I think maybe the police officer might have been able to stop to assist. But the police officer never took a position that he thought anybody was in the backseat injured. At the suppression hearing, the closest— Well, they called an ambulance, didn't they? That was only after they stopped the vehicle, looked inside, and found somebody had been shot. They called the vehicle after the seizure, not before, the ambulance. Yeah, but— The police officer gave his reason for the stop, Judge Greenway, as being A, it was his sixth sense that there was something untoward, and then later justified it by saying, I thought he might have been hiding from me in the back of the car. It's your position that a person acting furtively is not a basis for reasonable suspicion? A person acting what? He was— If you're laying down in the backseat of a car as you slowly go past a police officer, isn't that an attempt to lead the police officer to think or hope that the police officer doesn't notice you? Not necessarily. If they had seen him, for example, sitting up and then ducked down, maybe Your Honor is correct. But there's nothing that prohibits somebody from laying down in the backseat of a car. There's nothing to suggest that there's anything wrong with that. There's no indication that he was coming from an area where the gunshots were even fired. And I don't know that laying in the backseat of the car doesn't take what we would describe as reasonable suspicion to a place where it has never been before. There was no reason to believe that anybody was doing anything wrong. It does not constitute reasonable suspicion in broad daylight for somebody to lay down in his car. Let's go back a step. Officer Gumbs testifies that he sees the silver car go down this particular street. Yes, sir. Okay. The officers also testify that they see the red car leave a particular house on that street. No, sir. Coming down that road. I thought there was testimony that they saw the red car pull out from a house on that road. From the general vicinity where a house could be. Yes, sir. Okay. All right. Now, is there anything in the record that indicates how many houses are on that road? Yes, but that's developed later. That's developed really during trial testimony. There were three houses in that area. Does the record indicate there's more than one house? Yes, sir. That was not before the Court of Dispression? I don't know whether it was before the Court of Dispression. Yeah, it was before the Court of Dispression because they discussed the searches of the various houses. The court was well aware that there were three houses in that area. But you're saying three houses. Isn't it a fact that there were three buildings, all of which were searched? Yes, sir. All of which were the houses that were under the possession of the four people who were arrested? Ultimately, yes, sir. Okay. So there was no other set of buildings? No, there were just three buildings in that area. All right. That's correct. And in one building they didn't find any contraband, and that was the building that the car had been seen departing from. All right. I'm sort of out of time. Let me borrow a minute of my rebuttal time, if I might, to just finish this. Okay. Okay. Basically, what we're looking to do is suppress the identification, which they would not have had absent, Your Honor, the stop of the vehicle. Thank you. Thank you. And we'll have you back on rebuttal. Mr. Andrews. May it please the Court, Alfonso Andrews, Assistant U.S. Attorney, on behalf of the appellee. Your Honors, this is a case about the pursuit of a silver car speeding away from the vicinity of the discharging of shots and also attempting to evade the police. And it is that pursuit, i.e., the pursuit of the silver Camry that led to the discovery of the drugs in this case at 6-6 Catrin's Rest. And therefore, the issue raised by the appellant really is, well, let me backtrack. During that pursuit- I thought Mr. Ensign said that the police were not pursuing the silver car. That, Judge Roth, is factually incorrect. Okay. And here's why. There's testimony from Gums. There's also testimony from Officer Abraham. And if I can go straight to it. On page 8 and 9 of the supplemental appendix, this is what they said. We decided to proceed to check out where the vehicle, referring to the silver Camry, had traveled. That's what Abraham says. Samuel Abraham. Gums says, in his testimony in the supplemental appendix on page 42, we decided to go in and find the car. And this is why I'm saying that this pursuit of the silver car is really what this case is about. It is also important to note that Gums, in addition to seeing the silver car and hearing the transmission about the discharging of shots, also saw Officer Heidegger in pursuit of that silver car. What we have is a chase from the scene of the vicinity of the discharging of the shots. The testimony of Gums was that he heard a large valley of shots. He was just so fortunate that he happened to have been in the same vicinity, i.e., Katrin's Rest, where the shots were fired. He said it was about a quarter mile to half a mile away. He said he heard the transmission. And the transmission that he heard, and this is from Gums and the supplemental appendix on page 40, Heidegger said that the vehicle left the vicinity of the discharge of the shots at a high rate of speed. He goes on to say that he, this is Gums, now he observed that same speeding silver vehicle turn into the roadway, which is referred to by an octagon-shaped house, some say a dome-shaped house, some call it a round house. He also said, and it's on page 40 of the supplemental appendix, that he saw the vehicle and he saw Officer Heidegger following behind. He also said that that silver vehicle traveled in the roadway and went all the way to the rear. This is on page 42 of his testimony. And that is important, because when they proceeded into that same roadway in pursuit, not of a red car, but in pursuit of the silver car, that is when they encountered the red car. If this court, and let me backtrack. What's unusual or suspicious about encountering a red car when you were following a silver car? A couple of things. If you just look at it from those two facts, nothing. But if you consider the fact that the officers knew that that roadway had no exit. I'm trying to see where I can find that in the transcript. Gums specified that one way in, one way out. So then, this is what you have. Officers know that there's been a discharging of shots. They know that this silver vehicle is speeding away from that vicinity. It goes into essentially a one way street, one way in, one way out. And as they're entering, out is coming this red car. It's driving slowly. It's also important to note that the testimony is that that vehicle traveled in what was described as an L pattern. Contrary to what counsel was saying, the testimony is that it came from the vicinity of the house. And so, they're seeing this vehicle coming. Then it turns, see an L shape, and now it's coming towards them. And it's still driving slowly. In fact, Gums specified it was going extremely slow. But weren't the two police cars going down the road side by side? This is true. However, that does not justify the slow driving prior to the time that they turned to come face into it where the police were. What's suspicious about driving slowly? Well, we can only draw Judge Fisher based upon what the testimony is from Gums who was there at the scene. His response to that was there was no reason for the vehicle to be traveling that slowly. So, without more facts as to the nature of the roadway, the length of the road, what we're saying is that based upon his training and experience, there's no reason for that. And then it turns, and it's coming out. So, I think what's most significant here is that the vehicle was traveling out of the same roadway that this suspicious silver vehicle was basically running from the police entered, and there's no way out. And so, we don't know if the occupants switched, for instance. If this court is to follow the opponent's argument to its logical end, what the officer should have done when they saw this vehicle coming slowly, the driver looking at them, someone in the back laying down, they should have said, wow, since this vehicle is not silver, I have to let it go. Instead of saying, let me- That the red vehicle is a red herring. That the police, because they were following the silver car, would ultimately have gotten back to the house where they would have seen the marijuana plant. Judge White, I agree with you 100%. That's why in my alternative argument, I argue that really a lot of this is just academic. And the reason it's academic is because irrespective of the encounter with the red vehicle, the officers had already set their minds on going to find this silver car. And so, if the red car did not pass by, they would have still pursued, because they knew that this vehicle went to the back where this house was, and they wanted to go find that vehicle, and they did. Now, you, in your brief, you labeled this argument that it was moot, that the validity of the car stop was moot since the evidence was seized from the house. Don't you really mean that there's an exception to the exclusionary rule here under the well-known exception called the inevitable discovery rule? Don't you really mean that? I think I meant it's moot because of the independent source doctrine. They are a similar concept. So one of those two exceptions is what you intended to argue. Exactly. Okay. Irrespective of whatever happened, their minds were already set, based upon the testimony, on trying to find this silver vehicle. And that is why it started out like that. Let me stop you at the independent source argument that you made. The counsel for Mr. Thomas, though, makes the argument that the stop is important because if you don't stop the red car, you don't know about his client. You don't know his ID. Yeah, his client conceivably could have gone scot-free because you'd have gotten to that house, you'd have found the silver Camry, you'd have found the occupants who were scurrying about, Nathaniel Thomas and the young woman who were there, you'd have found them, but you wouldn't have known anything about him and Thomas. Well, that's not completely true. In fact, it is clear, obviously, that the mere discovery, let's say, of Ammon Thomas in this red vehicle on his way out would fall woefully short of the improbable cause to somehow charge him with drugs that were seen in plain view all around his house. And it was his house? Yes, and the testimony that came in our trial shows that it's his house, that his girlfriend testified to that, and so did his sister, Lakia Abbott. Was it his house or Nathaniel's house? No, it was Ammon Thomas's. Okay. In fact, his girlfriend testified to that. She lived there. She lived there with him. She said she'd see him come in there every day. Actually, it was that testimony that the government utilized to establish the connection between him and the drugs that were around the house. Sure, if the police saw him in a vehicle leaving, there is some relevance or connection to the area, but certainly that would not even be enough to get a warrant. And I would submit to the court also, because the warrant in this case has not been challenged, and because it was on the basis of the warrant that the search was conducted, all of this ends up being moot. The drugs, as Officer Howell testified to, and I believe Gomes as well, as they walked up to the house, the drugs were right there in plain view. The terrain of the house was this silver speeding vehicle. And this is why I say that irrespective of what happened with that red vehicle, they would have gone there anyway. We just take the position that under the circumstances, if this court is to judge the totality of the circumstances from the viewpoint of the law enforcement officers who was at the scene, that you would find that their stop of this vehicle was reasonable. In part because of the close proximity from where the discharge of the shots occurred to where the entrance was. I think they said it was approximately a quarter of a mile. And you put that together with the person laying in the vehicle, the vehicle coming out. It was very prudent for them to at a minimum stop that vehicle and determine whether or not this vehicle or the occupant had any involvement with the shooting that had occurred. And separate from that, I say independently or separately that the police would have found that evidence anyway. And there was nothing in the vehicle other than amatama that was seized as a result of this alleged illegal search that was put into evidence. And so I see my time is up. I will ask that the court, based upon this argument, perform the judgment of the district court. Thank you, Mr. Andrews. And Mr. Anton? Briefly. It's more than just his identity in the car. I don't disagree with Mr. Andrews. I guess I really didn't have any time. No, you did. You had four minutes. Okay. I don't disagree with him that the ownership of the house was with amatamas. But what the stop did was it placed amatamas there at the scene at that time. Now, there's some free-growing marijuana outside of the house that could have been ascribed to anybody. But as a result of the seizure of the vehicle and of amatamas, those facts all were part of the application for the search warrant that gets a search warrant issued to go inside the house where more additional drugs are found in the house that amatama lives. How close are the marijuana plants that you just alluded to, to amatamas in the house? They're growing in the area behind the house area, which is scrubby and brushy. There's nothing that you could say definitely would have tied him to it any more than it would have tied Nathaniel Thomas or the two women to the outside drugs. They weren't on the property? They were on the property or in the area of the property, yes, sir. If they're on the property and it's his house, why wouldn't it be ascribed to Mr. Thomas? Because it becomes an issue of joint possession. And you still have to show he had knowledge that they were growing there and that he had something to do with them. The fact that they were simply there absent knowledge and any number of people who could have had knowledge that they were there is a joint possession issue. Well, so help me now. The prosecutor mentions either inevitable discovery or independent source and says there are only three houses down that road. So with no red car, they know the silver house is at one of those and there are marijuana plants growing outside of Mr. Thomas' house. What's wrong with his argument? Well, because there were three houses and different people lived in each of the houses. The marijuana was growing in proximity to more than one of them and it was not necessarily the one where he resided. But more importantly, there was no showing other than the fact that he was found in that red Mitsubishi that he resided there at all. Ownership and residence and actually being there are two separate things. Absent putting him in the red Mitsubishi, there would have been no way to tie him to the location at that point in time. But it was on his property. Yes, ma'am. Absolutely it was on his property. But something could grow on your property if you're not present and somebody else put it there, went there and harvested it, and you weren't going there, you would have that defense that you could raise. You could say, I hadn't been there in months. I was estranged from my wife. Make the argument. But if they've got you coming down from that property, that puts you— Well, they very easily could have determined that it was his house and he had been there frequently because his girlfriend testified to that. But you can't take that position if the suppression motion is denied because there really wasn't any kind of parsing, what would be excluded and what would be allowed and who would have testified and who wouldn't have testified and who would have been charged and who wouldn't have been charged. Everything sort of gets cut off by virtue of the suppression motion being denied because the stop was validated. If you invalidate the stop, then you get into the issue as to what would have been suppressed and what would have come in and what would not have. Mr. Anton, I want to get back to a point I asked you about earlier. You said in rebuttal here that the record shows that other people were living in those other houses. Surely. I thought the record showed that these three buildings that were referred to were all buildings that were under the possession of the Thomases. Well, the— There's a difference. Not just Amnon Thomas. There was more than one family in the first house that they went into, which is the first house that they came to and knocked on the door. They found no marijuana in at all. And that's my time, Your Honor. We'd ask for the reason set forth in the brief that this matter be reversed and the court find that the suppression should have been granted and a determination be made as to what needed to be suppressed. I'd just like to ask Mr. Anton one question on that. Yes, Your Honor. Were there other families living in those other houses, those other buildings? Does the record show that? It depends on what you're referring to as the other buildings. Pardon? It depends on what you're referring to as the other buildings. Well, it was unclear to me from the record as to how many buildings there were to start with. Mr. Anton has said twice that there were three buildings. I thought that the three buildings that were being referred to were all buildings on Thomas' property. If you're right, yes, there were three buildings in that area where he resided. This is T-111 structure that they referred to, and in very close proximity is these two other structures. Were they buildings where people lived? No. They were not? Just his house was the building that people lived in. The other two weren't occupied. Okay. However, there is evidence. Sorry? I think one was sort of like a trailer or something, and the other one was like a storage shed. Okay. So they were not. But there was another house, a concrete, a masonry structure that belonged to his sister. This went to the testimony of Abraham on page 17 and 18. That house was some 300 or 400 feet away, though. What was the citation on that again? Yeah, page 17 and 18 of the supplemental appendix of the testimony of Samuel Abraham. He's the one that searched that residence. All right. Thank you, Mr. Andrews. And we thank counsel. We thank both counsel for a case that was well argued, and we'll take the matter under advisement.